**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL L. AUSTIN, JR., | ) | CASE NO. 4:21-CV-00209-JPC |
| | ) | |
| Petitioner, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| WARDEN DONNIE MORGAN, | ) | CARMEN E. HENDERSON |
| | ) | |
| Respondent, | ) | **REPORT & RECOMMENDATION** |
| | ) | |

## I.     Introduction

Michael L. Austin Jr. ("Petitioner") seeks a writ of habeas corpus under 28 U.S.C. §
2254.  Petitioner is an Ohio prisoner who is currently serving a prison term of three consecutive
life sentences without parole, fifteen years to life, and twenty-three years for three counts of
aggravated murder with firearm specifications, one count of murder with a firearm specification,
and engaging in a pattern of corrupt activity.  (ECF No. 10, PageID #: 161-62).  He now asserts
two grounds for relief.  (ECF No. 1 at 5-6).  Warden Donnie Morgan ("Respondent") filed a
return of writ on October 6, 2021.  (ECF No. 9).  Petitioner, through counsel,[1] filed a traverse on
April 1, 2022. (ECF No. 21).  Respondent filed a sur-reply on April 4, 2022.  (ECF No. 22).

This matter was referred to the Court under Local Rule 72.2 to prepare a report and
recommendation on Petitioner's petition and other case-dispositive motions.  Because Petitioner

---

[1] Although Petitioner initially appeared pro se, the Court appointed counsel on Petitioner's motion.  (*See* ECF No.
12).

1

has presented only meritless claims, I RECOMMEND that the Court deny his petition in its entirety and not grant him a certificate of appealability.

## II.    Relevant Factual Background

The Ohio Court of Appeals for the Seventh Appellate District set forth the following facts[2] on direct appeal:

> {¶7} The jury trial began on April 25, 2016. Testimony offered by the state established the framework of a drug distribution network run by [Dewaylyn] Colvin and [Vincent] Moorer. The members of the organization were divided in two groups based on their allegiance to either Colvin or Moorer. Colvin and Moorer kept the two factions separate for fear that subordinate members of the organization would collaborate and overtake the business. As a consequence, the two groups functioned separately from each other but as equal parts of the drug distribution network. Drug crimes committed by the organization were the subject of a series of indictments from 2011 to 2015, which resulted in the pleas and convictions of several of its members, including Colvin and two individuals who testified at Appellant's trial.
>
> {¶8} M.P., who pled to and was convicted of drug charges in 2015 approximated the organization's monthly revenue to be a "couple hundred thousands." (Tr. 1297). Witnesses characterized Appellant, Hakeem [Henderson], [Melvin] Johnson Jr., and R.H. as enforcers, hitters, or shooters for the organization.
>
> {¶9} The following evidence was offered by the state to establish Appellant's role in the shooting deaths of A.C. and R.H. S.M., a resident of Victory Estates, a housing project on the east side of Youngstown, Ohio testified that she, her cousin B.A., and A.C. were present at her apartment on Woodcrest Avenue on November 12, 2011. S.M. conceded that she and A.C. were "high as f*ck" as a result of copious illegal drug use that evening, and that they were engaged in a clandestine romance.
>
> {¶10} R.H., who is also S.M.'s cousin, called her multiple times to ask who was present at her apartment that evening, but she did not divulge that A.C. was there. When R.H. arrived, uninvited and unannounced, he and S.M. bickered for a short time. R.H. and A.C. then began "fumbling" with R.H.'s gun in the kitchen until A.C. cleared a jam. Around that time, A.C., who was drug sick, became physically ill and exited the apartment through the back door to vomit in the yard.

---

[2] The facts found by the appellate court of record "shall be presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

{¶11} According to S.M.'s testimony, roughly five minutes after A.C. left the apartment, S.M. heard gunshots. She testified that, ten to twenty minutes later, after she recovered from the initial shock and overcame her fear, she went to the back door. R.H. prevented her from exiting the apartment because he feared for her safety. From the rear window, S.M. saw A.C. lying on the ground between the patio and the sidewalk. He was holding his chest. S.M. turned from the back door and called 9-1-1, then handed the phone to B.A. to provide the relevant information to emergency services.

{¶12} When S.M. returned to the back door, R.H. had released the door handle and was in a neighboring yard. S.M. approached A.C., who was bleeding from bullet wounds to his face, elbow, and shoulder. S.M. asked A.C., "please tell me my cousin didn't do this." (Tr. 579). According to her testimony, A.C. "[shook] his head no." (Tr. 580.) S.M. specifically asked A.C. who shot him, and he answered, "Mike." Because A.C.'s mouth was filled with blood and he was struggling to breathe, S.M. told him to wait until the police arrived to describe the attack.

{¶13} S.M. went back into the apartment to confirm that the police were en route. When she returned to A.C., R.H. was gone, but a group of onlookers had gathered at the crime scene.

{¶14} When S.M. was questioned by police that evening, she omitted A.C.'s identification of "Mike" as the gunman from her statement. S.M. first mentioned the identification to law enforcement in a videotaped interview that was conducted a few months before the trial. However, W.B., a bystander at the scene, identified S.M. as the individual that could be heard in the background of the 9-1-1 recording yelling that Appellant was the gunman.

{¶15} W.B. further testified that she noticed Appellant at the housing project earlier that same day with two others. All three were wearing black clothing and hoodies on a warm day. Later that evening, W.B. saw Appellant and another person lurking around S.M.'s apartment. W.B. believed Appellant was armed due to a bulge in his jacket.

{¶16} Just prior to the shooting, C.B., A.C.'s aunt, called 9-1-1 because she saw two young men wearing black clothing with hoods walking through Victory Estates with guns. After a police car circled the housing project and departed, C.B. called 9-1-1 a second time to report that she saw the men again, one walking up the back of Woodcrest Avenue and the other walking up the front. Then she heard gunshots.

{¶17} A.C. died before the police arrived. Four bullets were recovered from his body. A few days later, R.H.'s body was found at an intersection on the east side of Youngstown. He had been shot 18 times.

3

{¶18} R.E., an inmate at Northeast Ohio Correctional Center, testified that Appellant began confiding in him because of R.E.'s paralegal background, when they were both housed at the county jail. R.E. testified that Appellant admitted to fatally shooting A.C., explaining that R.H. lured A.C. out of the apartment and Hakeem drove the getaway car. Appellant further admitted that he killed R.H. because R.H. was disclosing information about the A.C. murder. Appellant said that Hakeem drove the car, with Colvin in the front seat, and Appellant in the backseat next to R.H. Appellant told R.E. that he fatally shot R.H. then kicked his body from the vehicle.

{¶19} During the trial, A.H., a key state's witness and a member of the organization, refused to appear due to fear of reprisal by the defendants. A.H. had entered a plea and was convicted in the 2011 drug indictment; however, his plea agreement did not contain a provision regarding cooperation with the state.

{¶20} A hearing was conducted to determine whether A.H.'s statements could be used at trial under the forfeiture by wrongdoing exception to the prohibition on hearsay. The trial court overruled objections by the defense, allowing the admission of A.H.'s February 26, 2013 videotaped statement to the police, and the testimony of a detective regarding his transcribed follow-up interview with A.H. on February 4, 2015.

{¶21} In his recorded statement, A.H. explained that he was at his residence with his brother, J.M., on the night that A.C. was fatally shot. J.M. was the victim of the attempted murder and felonious assault convictions of Moorer and Johnson Jr. in a separate trial. Appellant, Colvin, Hakeem, and R.H. stopped at the A.H.'s residence that evening to ask A.H. and J.M. for masks.

{¶22} Appellant and R.H. explained that they were going to Victory Estates to "take care of ... whatever [member of A.C.'s family] they could find", as the word on the street was that a member of A.C.'s family was planning to rob Colvin. During his transcribed follow-up interview, A.H. stated that Colvin articulated the plan, and Appellant, Hakeem, and R.H. expressed agreement with its execution. The four men left in an automobile with Hakeem behind the wheel. A.H. testified that they were dressed in black, with the exception of Hakeem, who wore a black shirt and blue jeans.

{¶23} Appellant, Colvin, and Hakeem returned to A.H.'s residence an hour or two later without R.H. Appellant announced that he had shot a member of A.C.'s family, but did not know which one, because they looked alike. They told A.H. that there had been a $10,000 price set for the hit, so they went over and "served [the] dudes" and "put some work in." (DVD Tr. 24-25; Tr. 1128). Because J.M.'s girlfriend, S.J. was staying with his mother, A.H. and J.M. took Appellant and Hakeem to S.J.'s apartment in Boardman, Ohio to evade law enforcement.

{¶24} A.H. further explained that Colvin, Appellant, and Hakeem planned R.H.'s murder because he was divulging information about the A.C. murder. On the day R.H. was murdered, A.H. saw R.H. in a vehicle, which was being driven by Hakeem, with Colvin and Appellant.

{¶25} According to A.H.'s statement, Appellant, while under the influence of MDMA, described to A.H. the circumstances surrounding both murders. R.H. entered the apartment in order to lure A.C. into the back yard, and Appellant shot A.C. while he was vomiting. Appellant was troubled by the expression on A.C.'s face after he had been shot. According to Appellant, during the automobile trip that would end in R.H.'s murder, R.H. kept telling Appellant that he loved him, as if R.H. knew that he was going to be killed. Appellant also expressed anger that he was never compensated for the A.C. murder.

{¶26} Appellant's role in the R.S. and K.M. murders was established at trial by the testimony of F.P., a member of the organization who testified pursuant to a plea agreement in a drug indictment, which required cooperation with the state. F.P. testified that he had known Colvin for a number of years because F.P. had sold drugs for the organization. F.P. also knew Appellant and identified him in the courtroom. F.P. testified that Colvin referred to Appellant as "Nephew." F.P. learned of the R.S. and K.M. murders while he was in the county jail in 2012.

{¶27} After F.P. was released, Colvin offered him the opportunity to resume selling drugs. At that time, Colvin told F.P. about the R.S. and K.M. murders. F.P. testified that Colvin's goal in admitting to the murders was to "put fear in [F.P.]. * * * to put fear in people." (Tr. 1198.)

{¶28} Colvin stated that "Nephew" murdered R.S. and K.M. Colvin explained that R.S. was murdered because he disrespected Moorer's girlfriend, T.E. when he assaulted her at a bar. Colvin conceded that K.M., who was in R.S.'s car when he was ambushed, was an innocent bystander. Appellant also admitted to F.P. that he killed R.S. and K.M.

{¶29} F.P.'s testimony regarding the R.S. and K.M. murders was corroborated by M.P. M.P. testified that Appellant and Moorer discussed the R.S. and K.M. murders with M.P. at T.E.'s house. According to M.P., R.S. and K.M. were murdered because R.S. had assaulted T.E. at a bar and "the team gonna look bad if they didn't [retaliate]." (Tr. 1306.) Moorer said "[t]hey put Mike on it," and Appellant added that "he had to put [R.S.] down." (Tr. 1306-1307.)

{¶30} M.P. further testified that Appellant and Hakeem complained that they never received payment for the murders. Appellant said they were supposed to "come in, pull [their] moves and get paid and go back and leave town." (Tr. 1301-1311).

5

{¶31} Joseph Ohr, M.D., Mahoning County Forensic Pathologist and Deputy Coroner, performed autopsies on A.C., R.H., R.S., and K.M. Dr. Ohr testified that A.C. would have died within two to three minutes of sustaining the gunshot wound that entered his chest then severed his carotid artery and jugular vein. R.H. suffered 31 separate entrance and exit wounds. Dr. Ohr testified that R.S. was shot six times and sustained nine bullet wounds. K.M. sustained three gunshot wounds and died as a result of gunshot wounds to her head.

*State v. Austin*, No. 16 MA 0068, 2019-Ohio-1185, ¶¶ 7-31 (7th Dist. Ohio Mar. 29, 2019).

## III.    Relevant Procedural History

### A.    Indictment

On May 21, 2015, Austin and five codefendants were indicted in a multi-count superseding indictment.  (ECF No. 10, PageID #: 100-15).  Austin was charged with four counts of aggravated murder with firearm specification (Counts 1, 4, 10, 11); four counts of possession of a firearm while under disability (Counts 3, 6, 9, 12); and one count each of attempted murder (Count 7); felonious assault (Count 8); and engaging in a pattern of corrupt activity (Count 29). (*Id.*).  Petitioner pleaded not guilty to all counts on May 26, 2015.  (*Id.* at PageID #: 116). Ultimately, the possession of a firearm while under disability counts were dismissed by the State on November 16, 2017.  *Austin*, 2019-Ohio-1185 at ¶¶ 4-5.

### B.    Trial, Verdict, and Sentencing

Petitioner and one codefendant proceeded to trial on April 25, 2016.  *Id.* at ¶ 6-7. Petitioner was found guilty on Counts 1, 4, 10, and 29, and guilty of the lesser included offense of murder on Count 11.  *Id.* at ¶ 1.  The trial court sentenced Petitioner to life without parole for each of the three aggravated murder convictions, plus three years for each of the corresponding firearm specifications; fifteen years to life for the murder conviction, plus three years for the

firearm specification; and eleven years for the pattern of corrupt activity conviction, each to be served consecutively.  *Id.* at ¶ 2.

### C.    Direct Appeal

Petitioner filed a notice of appeal with the Seventh District of the Ohio Court of Appeals on May 19, 2016 and an appellate brief on April 18, 2018.  (ECF No. 10 at PageID #: 163, 178-217).  In his appeal, he raised seven assignments of error:

> 1. The trial court erred by permitting the State to play over objection an unsworn video interview with [A.H.].
>
> 2. The trial court erred by permitting [S.M.] to testify that [A.C.], in response to her leading questions, said that the person who shot him was "Mike."
>
> 3. The trial court erred by permitting a detective to testify, over objection, that unnamed witnesses had been saying that Michael Austin was associated with the death of [A.C.].
>
> 4. The trial court erred by refusing to permit Michael Austin to cross-examine a police officer about the officer's assertion that a key state witness had not acted illegally.
>
> 5. Cumulative error prejudiced Michael Austin.
>
> 6. The trial court erred and abused its discretion by sentencing Michael Austin to life without parole.
>
> 7. The record clearly and convincingly does not support the trial court's findings in support of consecutive sentences.

(ECF No. 10 at PageID #: 186-87).  The State filed an opposition brief on June 14, 2018, and Petitioner filed a reply on July 30, 2018.  (*Id.* at PageID #: 226-83).  On March 29, 2019, the appellate court rejected Petitioner's assignments of error.  (*Id.* at PageID #: 284-312).

### D.    Appeal to the Ohio Supreme Court

Petitioner filed a notice of appeal and memorandum in support of jurisdiction with the Supreme Court of Ohio on May 10, 2019.  (ECF No. 10 at PageID #: 313-28).   In his

memorandum, Petitioner raised the following propositions of law:

> 1. Trial Court erred when the Court admitted the video interview of [A.H.] over objection violating his Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.
>
> 2. Trial Court erred by permitting [S.M.] to testify that [A.C.], in response to her leading questions that the person who shot him was "Mike" violating his Sixth and Fourteenth Amendments.
>
> 3. Trial Court erred permitting a detective to testify over objection that unnamed witnesses had said Appellant was associated in the death of [A.C.] violating his Sixth and Fourteenth Amendments.
>
> 4. Trial Court erred by refusing to allow Appellant's counsel to cross-examine a police officer about his assertion that a key witness had not acted illegally, violating his 5th, 6th, and 14th Amendments.
>
> 5. Cumulative error prejudiced Appellant, violating his Fifth, Sixth, and Fourteenth Amendments.
>
> 6. Trial Court erred and abused its discretion by sentencing Appellant to life without parole violating his Eight and Fourteenth Amendments.

(*Id.* at PageID #: 319-26).  The State did not file a response brief.  The Supreme Court of Ohio declined to accept jurisdiction on June 26, 2019.  (*Id.* at PageID #: 360).

### E.     Ohio App. R. 26(B) Application to Reopen

Petitioner filed an application to reopen his direct appeal with the Seventh District on May 10, 2019.  (ECF No. 10 at PageID #: 361-69).  Petitioner asserted he received ineffective assistance of counsel because his appellant counsel failed to raise the following arguments:

> 1. Appellant's rights to due process and fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution were violated by various instances of prosecutorial misconduct.
>
> 2. Appellant's right of due process and fair trial under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Section Ten Article One of the Ohio Constitution were violated when trial court overruled motion for mistrial when unlawful contact with the juror occurred regarding this case during trial.

8

(*Id.*).  The State filed a response brief on May 29, 2019.  (*Id.* at PageID #: 397-404).  The appellate court denied Petitioner's application for reopening on September 27, 2019.  (*Id.* at PageID #: 405-12).

### F.    Appeal to the Ohio Supreme Court

Petitioner filed a notice of appeal concerning his application to reopen and memorandum in support of jurisdiction with the Supreme Court of Ohio on October 30, 2019.  (ECF No. 10 at PageID #: 413-23).  In his memorandum, Petitioner raised the following propositions of law:

1. Appellant's rights to due process and fair trial under the 5th, 6th, and 14th Amendments of the United States Constitution were violated by various instances of prosecutorial misconduct.

2. Appellant's right to due process and fair trial under the 5th, 6th, and 14th Amendments of the U.S. Constitution were violated when trial court overruled motion for mistrial when unlawful contact with juror occurred regarding this case during trial.

(*Id.* at PageID #: 419-21).  The Supreme Court of Ohio declined to accept jurisdiction on January 21, 2020.  (*Id.* at PageID #: 433).

### G.    Federal Habeas Corpus Petition

Petitioner petitioned pro se that this Court issue a writ of habeas corpus on January 7, 2021.  (ECF No. 1).  He asserted the following grounds for relief:

**Ground One:** Ineffective assistance of Appellate counsel for failing to raise Appellant's meritous claim of prosecutorial misconduct. Appellate counsel filed other grounds on direct appeal except for the obvious prosecutorial misconduct where prosecutors vouched for witnesses who testified to things in opposite of material fact.

**Ground Two:** Ineffective assistance of Appellate counsel for failing to raise Appellant's meritous claim of jury tampering.  Appellate counsel filed other grounds on direct appeal except obvious jury tampering, where an outside person contacted the juror who told other jurors and induced panic in the jury room.

(*Id.* at 5-6).

**IV.    Legal Standards**

**A.    Timeliness of Petition**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a one-year period of limitations for state prisoners to file their federal habeas corpus petitions. *Wall v. Kholi*, 562 U.S. 545, 550 (2011) (citing 28 U.S.C. § 2244(d)(1)); *Sexton v. Wainwright*, 968 F.3d 607, 609-10 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 1064 (2021). There is no dispute that Austin timely filed his federal habeas corpus petition within the 28 U.S.C. §2244(d) 1-year statute of limitations. (*See* ECF No. 9 at 14).

**B.    Jurisdiction**

Title 28 U.S.C. § 2254(a) authorizes district courts to entertain an application for a writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a State court." A state prisoner may file a § 2254 petition in the "district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him." 28 U.S.C. § 2241(d). The Court of Common Pleas of Mahoning County sentenced Austin, and Mahoning County is within this court's geographic jurisdiction. Accordingly, this Court has jurisdiction over Austin's § 2254 petition.

**C.    Cognizable Federal Claim**

Under 28 U.S.C. § 2254(a), a state prisoner may challenge his custody "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A petitioner's claim is not cognizable on habeas review if it "presents no federal issue at all." *Bates v. McCaughtry*, 934 F.2d 99, 101 (7th Cir. 1991). Thus, "errors in application of state law … are usually not cognizable in federal habeas corpus." *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007) (citing *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983)); *see also Estelle v.*

*McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions."). A federal habeas court does not function as an additional state appellate court; it does not review state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (citing *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987)). Instead, "federal courts must defer to a state court's interpretation of its own rules of evidence and procedure" in considering a habeas petition. *Id.* (quoting *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985)).

### D. Exhaustion

"A federal habeas corpus court should not grant a habeas corpus application by a state prisoner unless he has exhausted all of his available state court remedies on his grounds for relief. 28 U.S.C. § 2254(b) and (c)." *Gordon v. Bradshaw*, No. 104 CV 2299, 2007 WL 496367, at *12 (N.D. Ohio Feb. 12, 2007). "A petitioner satisfies the exhaustion requirement once the state supreme court provides him with an opportunity to review his claims on the merits and the state supreme court has had a full and fair opportunity to rule on the claims." *Id.* (citing *Dickerson v. Mitchell*, 336 F.Supp.2d 770, 786 (N.D. Ohio 2004) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir.1994); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990))). "If a remedy remains under state law that a federal habeas corpus petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot review the merits of the claim." *Id.* (citing *Rust*, 17 F.3d at 160). "When a petitioner has failed to exhaust his state remedies, and when he can no longer do so under state law, his habeas claim is procedurally defaulted." *Adams v. Burton*, No. 16-1476, 2016 WL 6610219, at *2 (6th Cir. Nov. 8, 2016) (citing *O'Sullivan*, 526 U.S. at 848).

E.      **AEDPA Standard of Review**

Title 28 U.S.C. § 2254, as amended by the AEDPA, provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

To determine whether relief should be granted, the Court must use the "look-through" methodology and look to the "last explained state-court judgment" on the petitioner's federal claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991) ("The essence of unexplained orders is that they say nothing. We think that a presumption which gives them no effect—which simply 'looks through' them to the last reasoned decision—most nearly reflects the role they are ordinarily intended to play."); *Wilson v. Sellers*, 138 S. Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.").

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'" *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotations and citations omitted). "[U]nder the unreasonable application

12

clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "The unreasonable application clause requires the state court decision to be more than incorrect or erroneous"—it must be "objectively unreasonable." *Id*.

Under § 2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(d)(2)). A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the trial court made a "clear factual error." *Wiggins v. Smith*, 539 U.S. 510, 528 (2003). A state court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. *Wood v. Allen*, 558 U.S. 290, 301 (2010). Even if "[r]easonable minds reviewing the record might disagree" about the finding in question, "on habeas review that does not suffice to supersede the trial court's … determination." *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). The prisoner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18 (citing 28 U.S.C. § 2254(e)(1)).

For state prisoners, the § 2254(d) standard "is difficult to meet… because it is meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). This is because, "[a]s amended by AEDPA, § 2254(d) is meant only to stop short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Id*. 103. "It preserves authority to issue the writ in cases where there is no possibility [that] fairminded jurists could disagree that the state courts

13

decision conflicts with this Court's precedents" and "goes no further." *Id*. Thus, in order to obtain federal habeas corpus relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

## V.    Discussion

Claimant asserts that he received ineffective assistance of appellate counsel because his appellate counsel failed to raise claims based on (1) prosecutorial misconduct arising from prosecutors vouching for witnesses and (2) jury tampering arising from a juror's contact with an outside individual.  (ECF No. 1 at 5-6).  Respondent argues that Petitioner is not entitled to relief because the state appellate court's denial of Petitioner's ineffective assistance of appellate counsel claims is not contrary to or an unreasonable application of the precedent set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  (ECF No. 9 at 26-27).  Because there is no dispute regarding jurisdiction, timeliness, or exhaustion, the Court addresses Claimant's grounds on the merits.

Petitioner takes the position that the state appellate court's decision "is contrary to or an unreasonable application of *Strickland*."  (ECF No. 21 at 10).  He argues that appellate counsel performed deficiently by choosing to present "an issue which was meritless" concerning his consecutive sentences rather than prosecutorial misconduct or jury tampering.  (*Id.* at 10, 13). Because Petitioner believes he would have been successful on these claims, he argues he was prejudiced by appellant counsel's failure to raise them.  (*Id.*).  As to the prosecutorial misconduct claim, Petitioner argues that the prosecutors "implied or asserted that a state witness was trustworthy, even going so far as to say that A.H., who was not subject to cross examination,

14

'was telling the truth.'" (*Id.* at 9).  The statements Petitioner challenges include the prosecutors arguing that (1) other testimony and evidence corroborated A.H.'s statements; (2) there were no inconsistencies with A.H.'s testimony; and (3) defense counsel was not able to attack A.H.'s testimony because "it was bulletproof" and "the truth."  (*Id.* at 8-9).  Concerning the jury, petitioner argues the trial judge's denial of a mistrial was unreasonable given the facts of the case, including that this was "a high publicity case involving the death of four individuals;" the charges "included a count of engaging in a pattern of corrupt activity, wherein the state argues that this was a gang that killed the people who got in their way;" and some jurors indicated "they were scared" after "two black men advised one of the jurors that 'You gotta be fair.'"  (*Id.* at 12-13).  Petitioner asserts that "he is entitled to an evidentiary hearing where he would establish the factual allegation as set forth in his petition."  (ECF No. 21 at 13-14).

Respondent replies that because Petitioner's trial counsel's failure to object to the prosecutors' closing argument limited appellate review to plain error review and such review "rendered the prosecutorial misconduct vouching claim meritless, … Austin's appellate counsel was not unconstitutionally ineffective for failing to raise a meritless claim."  (ECF No. 22 at 2).  Regarding the jury, Respondent asserts that the trial transcript "demonstrates that upon discovery of potential outside communication with the jury, the trial court conducted an extensive voir dire with each juror, and each juror assured the trial court that they could remain fair and impartial."  (*Id.* at 3).

The Ohio Court of Appeals reviewed each of Petitioner's claims in its review of his application to reopen his direct appeal.  First, it stated the applicable legal standard for the petition:

> {¶5} In order to show ineffective assistance of appellate counsel, the applicant must meet the two-prong test outlined in *Strickland v. Washington*, 466 U.S. 668,

104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Pursuant to *Strickland*, the applicant must demonstrate both deficient performance of counsel and resulting prejudice. *Id.* at 687, App.R. 26(B)(9). To show ineffective assistance of appellate counsel, Appellant must prove that his counsel was deficient for failing to raise the issues that Appellant now presents and that there was a reasonable probability of success had they presented those claims on appeal. *State v. Bradley*, 42 Ohio St. 3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

*State v. Austin*, 2019-Ohio-4076, at ¶ 5. The Court then reviewed and rejected both of

Claimant's assignments of error:

{¶7} In his first assignment of error, captioned "Merit one," Appellant argues that "[his] rights to due process and fair trial under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution were violated by various instances of prosecutorial misconduct." (App., p. 3.) Because no objection was made during closing argument, plain error is the applicable standard.

{¶8} "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R. 52(B). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Landrum*, 53 Ohio St.3d 107, 111, 559 N.E.2d 710 (1990), quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶9} To recognize plain error, we must find an obvious error which prejudiced Appellant by affecting his substantial rights, which requires a finding that there is a reasonable probability that the error resulted in prejudice. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. Invocation of plain error is discretionary. *Id.* at ¶ 23.

{¶10} Appellant alleges that the prosecutors bolstered the testimony of the state's witnesses and attacked the integrity of defense counsel during closing argument. Appellant cites to inconsistencies in the testimony of the state's witness for the proposition that the prosecutor's improper bolstering gave the state's witnesses a veneer of reliability.

{¶11} The prosecution is afforded wide latitude in summation and is permitted to fairly comment on the testimony and evidence. *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). Contested statements made during closing arguments are not viewed in isolation but in context and considering the arguments in their entirety. *State v. Treesh*, 90 Ohio St.3d 460, 466, 739 N.E.2d 749 (2001). When reviewing a claim of prosecutorial misconduct during closing arguments, we evaluate whether remarks were improper and, if so, whether they prejudicially affected the defendant's substantial rights. *State v. LaMar*, 95 Ohio

16

St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 168 (2002), citing *State v. Hessler*, 90 Ohio St.3d 108, 125, 734 N.E.2d 1237 (2000).

{¶12} A prosecutor is not permitted to vouch for the credibility of a witness at trial. Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue. *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138 (2018). Further, the prosecutor may not express a personal belief or opinion as to the credibility of a witness. *Id.* Similarly, it is improper for the prosecutor to denigrate or impute insincerity to defense counsel in the jury's presence. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 304.

{¶13} During closing argument, the prosecutor plainly stated that several of the state's witnesses were "telling the truth." The prosecutor characterized the testimony of one of the state's witness as "bulletproof," and argued that defense counsel's cross-examination of the witness revealed the defense's "desperation." (Tr. 1576, 1591-1592).

{¶14} Henderson challenged the very same statements by the prosecutor during closing arguments in his application to reopen. We opined that the disputed statements did not imply facts outside of the record, and that they were made in the context of discussing the corroborating evidence or the evidence countering a witness's motive to lie. *Henderson* at ¶ 10, citing *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 120. Recognizing that the question before us was the fairness of trial, not the culpability of the prosecutor, we concluded that there was no reason to believe the jury did not follow the court's instruction that closing arguments were not evidence, and, further, that the jurors were the sole judges of the credibility of the witnesses. *Id.*, citing *State v. Loza*, 71 Ohio St.3d 61, 79, 641 N.E.2d 1082 (1994) (it is presumed the jury will follow the instructions given by the judge).

{¶15} Defense counsel, in his closing argument, asserted that the state pressured witnesses to manufacture testimony to win a conviction. During the prosecutor's rebuttal, he posited that, if the state were inclined to manufacture evidence, it could have planted fingerprint and DNA evidence. The court sustained a contemporaneous objection by defense counsel and instructed the state to move forward with the argument. (Tr. 1648). The prosecutor thereafter provided examples of evidence that could have been provided to strengthen the state's case, and concluded, "I mean, let's face it, if we're going to lie, let's really lie." (Tr. 1651).

{¶16} We have previously observed that a prosecutor's comments directly responding to arguments advanced by the defense are unlikely to constitute grounds for reversal. *State v. Miller*, 7th Dist. Mahoning No. 17 MA 0120, 2018-Ohio-5127, ¶ 25. With respect to the specific comments at issue here, we opined in *Henderson, supra,* that "[t]he response by the state, even if exaggerated, did not

17

give rise to concerns about a fair trial. Prejudice is not apparent." *Henderson* at ¶13.

{¶17} Because prejudice is not apparent from the record, we find that the prosecutor's comments did not affect Appellant's substantial rights. We further find that appellate counsel's failure to raise prosecutorial misconduct in Appellant's direct appeal did not constitute ineffective assistance of counsel.

{¶18} In "Merit two," Appellant asserts that "[his] right of due process and fair trial under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Section Ten Article One of the Ohio Constitution were violated when [the] trial court overruled a motion for mistrial. When [sic] unlawful contact with the juror regarding this case during trial."

{¶19} Where there is claim that improper contact with a juror caused that juror or members of the jury to be biased, the defense must establish actual bias at the hearing on the topic. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 160. A trial court has broad discretion in dealing with the juror contact and determining whether to declare a mistrial; the granting of a mistrial is necessary only when a fair trial is no longer possible. *Id.*

{¶20} The trial court conducted a hearing on the comments made to Juror #3. Juror #3 explained that he walked by two gentlemen while he was wearing his "juror" badge, and overheard one them say "You're on the jury? You gotta be fair." Juror #3 conceded that he "scooted by" the gentlemen quickly and made no eye contact, and, as a consequence, he could not identify them. (*Id.*) Juror #3 warranted that the interaction would not affect his impartiality because "[he] didn't perceive it as a threat." Juror #3 reported it to the trial court after he mentioned the comment to Alternate Juror #1, in front of the entire jury. (Tr. 1035-1036).

{¶21} In seeking a mistrial, defense counsel pointed to reservations expressed by two jurors regarding their ability to remain impartial. (Tr. 1091-1092). Appellant predicates Merit two on the trial court's colloquy with Juror #5:

> THE COURT: Does the concern you have rise to the level where you would be unable to render a verdict based solely upon the evidence you hear during the trial, the arguments of counsel, and the instructions of law from the court?
>
> JUROR [#5]: I'm not so sure now. I mean, I'm not – I can't say yes. I can't say no. But since we're all being called in it seems like it's a very serious problem. It's not like one person and, you know, it's over and done with.
>
> THE COURT: Between you and me, it's not a serious problem. It's something that the law requires that I address individually just to make sure that everyone can still be fair and impartial based on what occurred.

JUROR [#5]: Well, I can be fair and impartial, you know, because there's two sides, you know, but it would make me a little edgy, I would imagine. I think it would make anyone edgy, you know, after what I overheard today.

THE COURT: I guess that's the ultimate question. It's only one that you can answer. Whether you call it edgy or fear or whatever the case is, would that affect your ability to render a verdict?

JUROR [#5]: I – I think I could render a verdict. It might be a little more difficult now than it was a few days ago.
(Tr. 1056-57.)

{¶22} After assurances by the trial court that the jury would be escorted to their vehicles each evening and that their anonymity had been maintained, Juror #5 warranted that he could return a verdict based on the evidence, arguments of counsel, and the instruction of the court. (Tr. 1059).

{¶23} The trial court questioned each of the jurors and informed them their addresses were not public, no photographs or cell phones were allowed in the courtroom, and deputies would escort them to their vehicles. All jurors ultimately answered they could render a verdict solely on the evidence and be impartial. The court declared its satisfaction that the jury could be fair and impartial based on its evaluation of each individual juror. (Tr. 1091).

{¶24} A trial court is permitted to rely on a juror's testimony in determining that juror's impartiality. *State v. Herring* (2002), 94 Ohio St.3d 246, 259, 762 N.E.2d 940; *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 114. Further, as we opined in *Henderson, supra,* the trial judge was in the best position to observe the jurors as they were being questioned and determine whether the incident affected their ability to remain impartial. *Henderson* at ¶ 17, citing *Conway*, 108 Ohio St.3d 214 at ¶ 163, *Herring* at 259.

{¶25} Having reviewed the transcript of the chambers hearing, we find no evidence of actual juror bias. We further find that appellate counsel's failure to raise juror bias in Appellant's direct appeal did not constitute ineffective assistance of counsel.

{¶26} In his application to reopen, Appellant has failed to establish a genuine issue as to whether he was deprived of the effective assistance of counsel in his direct appeal. Accordingly, Appellant's application to reopen is denied.

*Id.* at ¶¶ 7-26.

The Court disagrees with Petitioner that the state appellate court's decision is a contrary to or an unreasonable application of law.  The state court correctly identified *Strickland* as the standard for both claims and found that Petitioner "failed to establish a genuine issue as to whether he was deprived of the effective assistance of counsel in his direct appeal."  *Id.* at ¶ 26.

Moreover, the state court properly applied *Strickland* to the individual issues.  In his prosecutorial misconduct claim, Petitioner challenges the prosecutors' statements during closing argument that "A.H. was corroborated on multiple counts;" "A.H. was further corroborated by W.B. and C.B." and "by the ballistic evidence in this case;" "R.E. again corroborates A.H.;" "[a]t no point was [A.H.] inconsistent. Not one single inconsistency;" and A.H.'s testimony was "bulletproof. Because it was the truth. The truth doesn't change, lies change." (ECF No. 21 at 8).  The state court found these statements "did not imply facts outside of the record,  . . . were made in the context of discussing the corroborating evidence of the evidence countering a witness's motive to lie," or were made in response to arguments advanced by Petitioner such that the statements were not improper.  *Austin*, 2019-Ohio-4076, at ¶¶ 14-16; *see United States v. Busch*, No. 20-4065, 2021 WL 5133178, at *12 (6th Cir. Nov. 4., 2021) (prosecutor's statements that witness had "no motive to lie" because he was a "thief … not a liar" was not improper vouching because "the prosecutor merely urged the jurors—when making their own assessment of [the witness's] credibility—to draw certain inferences from the evidence produced at trial"). Further, the state court noted that because "there was no reason to believe the jury did not follow the court's instruction that closing arguments were not evidence, and further, that the jurors were the sole judges of the credibility of the witnesses," Petitioner was not prejudiced by the comments.  *Austin*, 2019-Ohio-4076 at ¶¶ 14-16.  Thus, Petitioner could not establish either element of a prosecutorial misconduct claim.  *See United States v. Joiner*, 727 F. App'x 821, 824

(6th Cir. 2018) ("To determine whether prosecutorial misconduct occurred, we employ a two-step analysis. First, we determine whether the statements were improper. Second, we ask whether the remarks were so flagrant as to warrant reversal.").  Consequently, Petitioner cannot show ineffective appellate counsel for failing to raise this meritless claim because appellate counsel's "performance is presumed to be effective" and this presumption is only overcome "when ignored issues are clearly stronger than those presented," and because Petitioner cannot demonstrate "a reasonable probability that, but for his counsel's unreasonable failure to raise an issue on appeal, he would have prevailed." *Dufresne v. Palmer*, 876 F.3d 248, 257 (6th Cir. 2017) (cleaned up).

Concerning the jury, Petitioner argues that "he was denied a fair trial by a panel of impartial, indifferent jurors." (ECF No. 21 at 11).  After a juror reported being told by two individuals that "you gotta be fair," the trial court questioned each juror separately in the presence of counsel and, while some expressed fear and concerns, every juror indicated they could remain fair and impartial and return a verdict based solely on the facts, arguments, and instructions of the court. (ECF No. 10-1, PageID #: 1710-68).  The state court found no evidence of actual juror bias because "[a]ll jurors ultimately answered they could render a verdict solely on the evidence and be impartial" and "[a] trial court is permitted to rely on a juror's testimony in determining that juror's impartiality." *Austin*, 2019-Ohio-4076, at ¶¶ 23-24.  Thus, the state court found that there was no evidence of actual juror bias. *Id.* at ¶ 25; *see Phillips v. Bradshaw*, 607 F.3d 199, 223 (6th Cir. 2010) (habeas relief was unwarranted, in the absence of evidence of actual bias, where trial court held a hearing after juror contact with a grand juror and concluded "based on the jurors' actions and assurances, that they could be fair and impartial arbiters").  Because the impartial jury argument was also meritless, appellate counsel was not

21

ineffective for failing to raise the argument and Petitioner cannot show a probability of success. *Dufresne*, 876 F.3d at 257.

This Court does not find that the state court improperly applied *Strickland* or unreasonably interpreted the facts of the case. Accordingly, Petitioner has failed to overcome AEDPA's highly deferential standard. He has not shown that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Bobby v. Dixon*, 565 U.S. 23, 24 (2011).

## VI.    Certificate of Appealability

### A.    Legal Standard

A habeas petitioner may not appeal the denial of his application for a writ of habeas corpus unless a judge issues a certificate of appealability and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of a constitutional right."). The "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The granting of a certificate of appealability does not require a showing that the appeal would succeed on any claim. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

### B.    Analysis

Petitioner's grounds for relief are meritless. If the Court accepts the foregoing recommendation, then Petitioner has not made a substantial showing of the denial of a constitutional right. He would then not be entitled to a certificate of appealability. Thus, I recommend that the Court not issue a certificate of appealability.

## VII.    Recommendation

Petitioner has presented only meritless claims.  Thus, I recommend that the Court deny his petition in its entirety and not grant him a certificate of appealability.

DATED: November 8, 2023

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).